1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| KENNETH JOSEPH BORRELLI, | ) | Case No.: 1:10-cv-02396-SKO |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER REGARDING** |
| v. | ) | **PLAINTIFF'S SECURITY** |
| | ) | **COMPLAINT** |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | (Docs. 1, 16) |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTRODUCTION

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his application for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). 42 U.S.C. §§ 405(g); 1383(g). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Docs. 5, 6.) The action was assigned to the Honorable Sheila K. Oberto for all purposes. *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; *see also* L.R. 301, 305.

**FACTUAL BACKGROUND**

Plaintiff was born on June 21, 1956, has a high school education, and worked for the last 28 years in the construction industry.  (Administrative Record ("AR") 40-41, 159, 170.)  On April 24, 2008, Plaintiff filed an application for DIB, alleging disability beginning December 13, 2007, due to pain in his back, knee, ankle, and shoulders.  (AR 153.)  Plaintiff also indicated that he was having "a hard time gripping things with both hands."  (AR 153.)

**A.  Medical History**

**1.  Medical Evidence in the Record Prior to the May 26, 2010, ALJ Decision**

On April 20, 2001, Plaintiff was referred to orthopedist Eric McMillan, M.D., for consultation regarding a painful left shoulder.  (AR 214.)  Plaintiff reported to Dr. McMillan that his shoulder had been hurting him "off and on" for a period of about two and a half months, but Plaintiff could recall no injury to the shoulder.  (AR 214.)  Plaintiff reported that the shoulder pain disturbed his sleep, but his symptoms were somewhat relieved by "minimization of overhead activity."  (AR 214.)  Dr. McMillan noted an impression of arthralgia of the left shoulder, and ordered a Magnetic Resonance Imaging ("MRI") scan.  (AR 214.)  On April 28, 2001, Plaintiff underwent an MRI administered by radiologist Hosam Moustafa, M.D. (AR 221.)  Dr. Moustafa reported that there was evidence of a moderate shoulder impingement with mild tendinitis/tendinopathy of the supraspinatus tendon with no evidence of rotator cuff tear.  (AR 221.)

On May 15, 2001, Plaintiff returned to Dr. McMillan for a follow-up examination.  (AR 213.)  Dr. McMillan reviewed the results of the MRI scan, and determined Plaintiff was suffering from rotator-cuff tendinitis of the left shoulder.  (AR 213.)  Dr. McMillan prescribed Naprosyn and a one-time physical therapy visit.  (AR 213, 225)

On July 12, 2001, Plaintiff was again seen by Dr. McMillan for a follow-up appointment with regard to Plaintiff's shoulder condition.  (AR 212.)  Dr. McMillan noted that there was improvement of the symptoms since Plaintiff's last visit.  Dr. McMillan reported that Plaintiff was "not interested in a more aggressive treatment approach such as corticosteroid injection or arthroscopy" because he was "improving with his home exercise program and the Naprosyn."  (AR 212.)

2

On August 14, 2001, Plaintiff was examined by Dr. McMillan and reported significant symptoms in his left shoulder. (AR 211.) Dr. McMillan discussed with Plaintiff the option of a shoulder injection, to which Plaintiff agreed; a shoulder injection was performed at that examination. (AR 211.)

On July 9, 2002, Plaintiff was referred to Jim Barnett, M.D. (AR 308-09.) Plaintiff presented with complaints of sciatica in his right leg. (AR 308.) Dr. Barnett indicated that an MRI scan showed "mild degenerative discs at 3/4" but was otherwise normal. (AR 308.) Dr. Barnett recommended that Plaintiff start taking Celebrex and Zanaflex, begin a pyriformis protocol, seek treatment by myofascial pain expert at Myodynamics, and undergo a pyriformis muscle injection. (AR 309.) On September 18, 2002, Plaintiff underwent a "right pyriformis block" and an "SI joint block" as treatment for his sciatica. (AR 306.)

On July 20, 2004, Plaintiff was again referred to Dr. McMillan, this time for complaints related to right-knee pain. (AR 210.) Plaintiff reported to Dr. McMillan that he initially injured the right knee approximately 18 years ago while snow skiing. (AR 210.) Plaintiff reported that his symptoms had worsened in the months prior to the examination, and he described the pain as a dull ache that is felt anteromedially. (AR 210.) Dr. McMillan noted an impression of osteoarthritis and a probable posterior horn medial meniscus tear of the right knee, and he ordered an MRI scan. (AR 210.) A radiology report dated July 12, 2004, indicated "moderately-severe degenerative changes in the medial compartment with slightly less pronounced osteoarthritis in the patellofemoral joint." (AR 219.)

On August 8, 2004, Plaintiff was seen by Dr. McMillan to review the MRI scan and determine a course of treatment. (AR 209.) Dr. McMillan noted the following:

> We could inject the knee, though that would really have no bearing on his meniscal symptoms short of temporary pain relief. I have suggested instead that we consider arthroscopy of the knee with treatment of the meniscal pathology and whatever treatment we can do as far as the osteoarthritis. I have counseled Mr. Borrelli that osteoarthritis is not really well treated by arthroscopic means in my experience and that I anticipate he would continue to have at least some amount of discomfort in the knee on an ongoing basis as a result of the osteoarthritis that we see by x-ray and MRI. Nevertheless, I think he would be significantly improved if we could rectify the meniscus injury and he is in agreement . . . .

(AR 209.)

1    On December 10, 2004, Plaintiff saw Dr. McMillan and they discussed Plaintiff's right-knee

2    surgical options. (AR 207.) Arthroscopy of Plaintiff's right knee was scheduled for December 16,

3    2004, as treatment for the meniscus tear. (AR 208.) The surgery was performed as scheduled (AR

4    222-24), and on December 21, 2004, Plaintiff saw Dr. McMillan for a surgical follow-up. (AR 206).

5    Dr. McMillan discussed with Plaintiff that there was "quite a bit in the way of degenerative change

6    at the knee" and that Plaintiff's long-term outlook for the knee "was somewhat guarded." (AR 206.)

7    Dr. McMillan noted that the treatment options for Plaintiff's degenerative arthritis in his knee

8    "consist mainly of arthroplasty options, which Dr. McMillan and Plaintiff both agreed were

9    "probably not appropriate for him at this point." (AR 206.) On January 7, 2005, Plaintiff saw Dr.

10   McMillan for examination of Plaintiff's knee. (AR 205.) It was noted that Plaintiff was "doing

11   relatively well with occasional discomfort at the knee" and Plaintiff had "good resolution of the

12   marked discomfort that he was having at nighttime preoperatively." (AR 205.)

13   On February 1, 2005, Dr. McMillan examined Plaintiff's knee, noting that Plaintiff was

14   reporting "ongoing discomfort along the medial jointline that is limiting his activities." (AR 204.)

15   Dr. McMillan indicated that it was "not a great surprise" that Plaintiff continued to have ongoing

16   pain "given the Grade IV chondromalacia[2] seen at the time of surgery." (AR 204.) Plaintiff and Dr.

17   McMillan discussed the treatment options and determined that it was most appropriate to start

18   Plaintiff on Naprosyn as treatment for his knee. (AR 204.)

19   On March 1, 2005, Plaintiff was examined by Dr. McMillan. (AR 203.) Dr. McMillan

20   indicated that, while Plaintiff's knee pain still existed, "it is certainly improved now as compared to

21   his preoperative condition. It seems to be exacerbated by activity and decreased a bit with rest."

22   (AR 203.) Plaintiff and Dr. McMillan determined that Plaintiff would try a "Neoprene-type sleeve

23   brace" while Plaintiff considered whether to submit to steroid injection therapy to treat the knee pain.

24   (AR 203.)

25   On May 27, 2005, Plaintiff was examined by Dr. Barnett for a return of his original lower-

26   back pain symptoms. (AR 293-94.) Dr. Barnett indicated that Plaintiff had last been examined by

27

28   [2] Chondromalacia is defined as the "softening of the articular cartilage, most frequently in the patella."
     *Dorland's Illustrated Medical Dictionary* 358 (31st ed 2007).

4

him on November 26, 2002.  (AR 293.)  Dr. Barnett recommended bilateral piriformis injections, and indicated that he would examine Plaintiff again when authorization to treat was received.  (AR 293.)

On August 30, 2005, Plaintiff reported to Dr. McMillan that he was experiencing pain around the medial posteromedial portion of his knee, which increased with activity and decreased with rest. (AR 202.)  Dr. McMillan discussed with Plaintiff the possibility of diagnostic surgical arthroscopy, but indicated to Plaintiff that the arthritic change could not be effectively addressed arthroscopically. Plaintiff indicated to Dr. McMillan that he would like to proceed with steroid injection therapy at the next visit, and expressed his interest in conservative care at this point.  (AR 202.)  On September 2, 2005, Plaintiff underwent a steroid injection in his right knee.  (AR 201.)

On October 6, 2005, Plaintiff was referred to Dennis W. Del Paine, M.D.  (AR 249.) Plaintiff reported to Dr. Del Paine that he had experienced low-back stiffness since his twenties. (AR 249.)  In the six years prior to the examination, Plaintiff noted that the stiffness extended into the upper part of his legs, shoulders, neck, hands, feet, and knees.  (AR 249.)  The stiffness would recur during driving or if he sits for any extended period.  (AR 249.)  Plaintiff also noticed that the stiffness did not necessarily worsen with exertion, but he reported feeling increasingly tired.  (AR 249.)  Other than fatigue, Plaintiff reported joint pain and some swelling in his hands.  (AR 249.) Dr. Del Paine noted his impression of Plaintiff's conditions as psoriatic arthritis, epigastric tenderness, and a history of kidney stone.  (AR 250.)

On October 11, 2006, Plaintiff was examined by Robert K. Greenlaw, M.D., for his knee pain. (AR 200.)  Dr. Greenlaw noted that Plaintiff had been seen in the past for injections in his right knee and that Plaintiff had also undergone arthroscopic surgery for his knee.  (AR 200.)  Dr. Greenlaw administered another steroid injection to Plaintiff's knee and indicated that Plaintiff was to "be careful of his knee, apply heat to his knee several times daily and avoid squatting, twisting, or straining his knee as much as possible." (AR 200.)  Dr. Greenlaw also noted that, "[j]udging from the previous photographs of the previous arthroscopy surgery, this patient is going to be a candidate for total knee replacement in the very near future." (AR 200.)

1    On October 10, 2006, Plaintiff was examined by Dr. Del Paine. (AR 247.) Plaintiff reported

2  worsening of his symptoms, and he had noticed stiffness in his hands primarily in the morning. Dr.

3  Del Paine prescribed Methotrexate. (AR 247.)

4    A December 5, 2006, treatment note of Dr. Del Paine indicates that Plaintiff had started

5  taking prednisone and felt that his symptoms had markedly improved. (AR 245.) Dr. Del Paine

6  reported there was still tenderness in Plaintiff's wrists, shoulders, "MCPs," and ankles. (AR 245.)

7  On January 16, 2007, Plaintiff was examined by Dr. Del Paine. (AR 243.) He noted he had one to

8  one and a half hours of stiffness in the morning, he was tired by one thirty in the afternoon, but he

9  felt significantly improved from his baseline with the addition of ethotrexate and low-dose

10  prednisone. (AR 243.) Dr. Del Paine also prescribed Humira, and scheduled a follow-up visit in

11  three months. (AR 243.)

12    On April 12, 2007, Plaintiff saw Dr. Del Paine for a follow-up visit. (AR 241.) Plaintiff

13  reported some fatigue after working and indicated that he spent most of the weekends resting; despite

14  persistent symptomatology, Plaintiff indicated that he has significantly improved with the addition

15  of the Humira. Plaintiff also reported less swelling in his hands and, while he experienced pain in

16  his neck, his lower-back pain was less. (AR 241.)

17    At a follow-up visit with Dr. Del Paine on July 24, 2007, Dr. Del Paine and Plaintiff

18  discussed the "association between work and exacerbation of arthritis," and Dr. Del Paine

19  "recommended that [Plaintiff] consider a job change." (AR 239.)

20    In October 2007, Plaintiff reported to Dr. Del Paine that he was having marked swelling in

21  his hands, wrists, elbows, and ankles. (AR 237.) Plaintiff also reported an increase in fatigue. (AR

22  237.) Dr. Del Paine prescribed doxycycline, recommended that Plaintiff follow-up in two to three

23  months, and indicated he had discussed with Plaintiff the importance of rest and a job change. (AR

24  237.)

25    From December 2007 to March 2008, Plaintiff was examined on several occasions by James

26  Knapp, M.D., for complaints related to lower-back pain. (AR 312-20.) Dr. Knapp referred Plaintiff

27  back to Dr. Barnett.

28

On March 13, 2008, Dr. Barnett submitted a consultation report indicating that a recent MRI scan revealed mild to moderate facet arthropathy in the lower lumbar levels and that Plaintiff's back pain may be due to facet syndrome. (AR 307.)  Dr. Barnett suggested "medial branch nerve blocks at L3/4, L4/5 bilaterally followed by re-evaluation." (AR 307.)   On April 2, 2008, Plaintiff underwent bilateral lumbar medial branch nerve blocks to the L3-4, 4-5, 5-1 facets, performed by Dr. Barnett. (AR 305.)

On April 17, 2008, Plaintiff reported to Dr. Del Paine that his arthritis was "significantly improved" on his current regimen of Enbrel 50, Methotrexate, Predinsone, and Aleve. (AR 233.) Dr. Del Paine indicated that Plaintiff's psoriatic arthritis was improved, and that he should follow-up in three months. (AR 233.)

On May 7, 2008, Plaintiff underwent a left lumbar radiofrequency ablation of the medial branch nerves at L2, 3, 4, and 5, performed by Dr. Barnett. (AR 304.)  On May 14, 2008, Plaintiff underwent a right lumbar radiofrequency ablation of the medial branch nerve to the L2, 3, 4, 5 facet joints. (AR 303.)

On June 17, 2008, state agency consultant Roger D. Fast, M.D., completed a physical residual functional capacity ("RFC") assessment.[3]   (AR 328-52.)   Dr. Fast opined that Plaintiff could occasionally lift and carry up to 20 pounds, frequently lift and carry up to 10 pounds, stand and/or walk for about six hours in an eight-hour day, sit for a total of approximately six hours in an eight-hour day, and had an unlimited ability to push or pull. (AR 349.)  Dr. Fast found that Plaintiff was limited in his ability to reach in all directions, but he was unlimited in his ability to handle, finger, or feel. (AR 350.)

---

[3] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. Social Security Ruling 96-8p. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

On September 24, 2008, state agency consultant G. Tyalor-Holmes, M.D., reviewed Dr. Fast's assessment of Plaintiff's RFC and affirmed that Plaintiff was capable of light work with a limitation for overhead reaching.  (AR 434.)

**2.      Medical Evidence Submitted by Plaintiff After the May 26, 2010, ALJ Decision**

On September 9, 2010, Plaintiff's counsel submitted additional medical records to the Appeals Council, seeking review of the ALJ's May 26, 2010, decision.  (AR 6.)  The letter from Plaintiff's counsel to the Appeals Council indicates that the medical records enclosed included an August 19, 2010,[4] report from Dr. McMillan and an August 16, 2010, chartnote from Dr. Temnyk. Plaintiff's counsel noted that both records indicate that Plaintiff was in need of a total right knee arthroplasty, which would tend to support Dr. Del Paine's contention Plaintiff could not be expected to walk or stand at all as part of his routine job duties.  (AR 6.)  Plaintiff's counsel also noted that he was attempting to obtain additional updated records from Dr. Del Paine's office and asked the Appeals Council to delay consideration of Plaintiff's appeal while Plaintiff's counsel attempted to obtain the additional records.  (AR 6.)

On September 21, 2010, Plaintiff's counsel submitted additional records from Dr. Del Paine to the Appeals Council.  (*See* AR 444.)  On November 5, 2010, the Appeals Council indicated that it had received additional evidence that it was making part of the record.  (AR 5.)  The Appeals Council noted that the records it was supplied by Plaintiff's counsel consisted of Dr. Del Paine's records dated October 6, 2005, to August 12, 2010.  (AR 5.)  These records were marked as Exhibit 13F.  (AR 5.)  The records the Appeals Council stated it considered and made part of the record did ***not*** include the July 19, 2010, report from Dr. McMillan or the August 16, 2010, report from Dr. Temnyk to which Plaintiff's counsel referred in the September 9, 2010, letter to the Appeals Council. (*See* AR 6.)

Without explanation, the July 19, 2010, report from Dr. McMillan has been included in the Administrative Record at pages 21-22, and the August 16, 2010, report from Dr. Temnyk is included in the Administrative Record at pages 23-24.  There is no indication, however, that the Appeals

---

[4] The record actually submitted by Plaintiff's counsel is dated July 19, 2010.  (*See* AR 21.)

1  Council reviewed these reports, although it is clear that the additional records from Dr. Del Paine

2  were expressly reviewed by the Appeals Council and were added to the record. (*See* AR 4.)  In any

3  event, the July 19, 2010, report from Dr. McMillan indicates Plaintiff has "end-stage" osteoarthritis

4  in his right knee, mild to moderate osteoarthritis in his left knee, rheumatoid arthritis, and probable

5  radicular symptoms in his right lower extremity. (AR 22.)  Dr. McMillan noted that he discussed

6  treatment options with Plaintiff and Plaintiff expressed that he would like to consider arthroplasty

7  of his right knee. (AR 22.)  On August 16, 2010, Plaintiff was referred to Dr. Temnyk. (AR 23-24.)

8  Dr. Temnyk diagnosed Plaintiff with symptomatic right knee degenerative joint disease, and

9  determined that right total knee arthroplasty was indicated. (AR 24.)  Plaintiff stated that he would

10 call Dr. Temnyk if he decided to undergo right total knee arthroplasty. (AR 24.)

11      Most of the remaining records submitted by Plaintiff's counsel on September 9, 2010, located

12 at pages 25 through 34 of the Administrative Record (*see* AR 35), are duplicates of medical reports

13 already contained in the record that were before the ALJ at the time of the May 26, 2010, decision.

14 For example, the report at AR 25 can also be found at AR 200; AR 26 is also found at AR 219; AR

15 30 is also found at AR 221; AR 31 is also found at AR 215; AR 32 is also found at AR 218; AR 33

16 is also found at AR 210; and AR 34 is also found at AR 209.  The record at pages 27 through 29

17 contains treatment notes from an unspecified provider, noting Plaintiff's complaints of right-knee

18 pain at various points between March 1, 2004, through July 20, 2005. (AR 27-29.)

19 **B.   Administrative Proceedings**

20      The Commissioner denied Plaintiff's application initially and again on reconsideration;

21 consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 67-

22 71, 88.)  On December 17, 2009, ALJ James M. Mitchell held a hearing where Plaintiff testified

23 through the assistance of counsel. (AR 36-66.)

24      **1.   Plaintiff's Testimony**

25      Plaintiff testified that he was 53 years old and had a high school education. (AR 38-39.)

26 Plaintiff stopped working in December 2007 due to pain in his knees, ankles, hands, and hips. (AR

27 39, 42.)   At his past work in the construction field, Plaintiff's duties included framing houses and

28 apartment buildings; Plaintiff worked in construction for 28 years. (AR 41.)  Plaintiff stopped

working because he continued to fall while at work and his foreman was concerned that he would get hurt. (AR 43-44.) Plaintiff went to see a doctor, and the doctor "took [him] off of work." (AR 44.)

Regarding his daily activities, Plaintiff prepares meals, washes dishes, and makes a bed on a daily basis; he does some household chores including mopping, sweeping, or vacuuming a few times a month; he helps with laundry approximately four times a month; Plaintiff grocery shops approximately ten times per month; and he spends approximately two hours per day watching television. (AR 44-47.) Plaintiff visits with friends approximately three times per week. (AR 47.) On an average day, Plaintiff spends time stretching and walking around attempting to move his legs; he sits and watches television, but must then get up again because he cannot sit very long. (AR 47.) Plaintiff drives a vehicle about seven times per week, traveling an average of two miles, making trips to the post office and the grocery store. (AR 48-49.) Plaintiff testified that he can stand or sit for approximately 20 minutes each, and he could walk a block-and-a-half. (AR 52.) He can reach out in front of him, but doing so causes him pain. (AR 53.) He can also reach overhead with his arms, but this action produces pain in the shoulder joints of both of his arms. (AR 53.) Plaintiff also explained that he has difficulty holding things in his right hand, such as pens, pencils, or eyeglasses. (AR 53-54.)

Plaintiff has been seeing Dr. Del Paine as his primary treating physician for approximately four years. (AR 50.) Dr. Del Paine had told Plaintiff not to stand or climb ladders or to walk very far. (AR 51.) Plaintiff testified he had not been to the emergency room in the 12 months preceding the hearing, and he was not under the care of a mental health professional. (AR 51.) When Plaintiff walks, his knees cause him considerable pain, medication and elevation of his legs for approximately 30 to 40 minutes provides some relief from the pain in his knees, and he does activities such as walking and stretching in a hot tub as therapy. (AR 57-59.) Plaintiff testified that he had undergone knee surgery, and that he was told by his doctors that he needs a knee replacement. (AR 60.) A knee replacement surgery had not yet been scheduled because his doctor informed him that he was not a candidate for surgery unless he was "completely retired." (AR 60.)

1     **2.    Vocational Expert Testimony**

2        Vocational Expert ("VE") Gregory Meyers also testified at the hearing.  (AR 61-65.)  He

3 described Plaintiff's last work as a carpenter, which is listed in the DOT as medium and skilled, but

4 as performed the job was in the heavy category.  (AR 62.)  There was no skill transferability to light

5 or sedentary work.  (AR 62.)  The ALJ asked the VE to consider a hypothetical person of Plaintiff's

6 age, education and work history who could lift or push/pull 20 pounds occasionally, 10 pounds

7 frequently; walk and stand frequently; sit, stoop, or bend occasionally.  (AR 62.)  The VE testified

8 that such a person could perform work in the categories of cashier, assembler of small products, and

9 housekeeper.  (AR 62.)

10        In a second hypothetical, the ALJ asked the VE to consider a person with the same exertional

11 limitations as in the first hypothetical, but with added non-exertional limitations that included the

12 following: unlimited in attention, concentration, understanding, and memory; vision diminished but

13 correctable; slightly limited in overhead reaching with both extremities – with slight being six hours

14 or less per shift; fine manipulative abilities intact, gross manipulative abilities slightly limited with

15 the right dominant feature; slightly limited in the ability to perform simple, repetitive tasks;

16 unlimited ability to be in contact with the public with occasional supervision; and experienced slight

17 to moderate pain.  (AR 63.)  The VE testified that the jobs identified in response to the first

18 hypothetical would be eroded 30 percent in number.

19        As a follow-up question, the ALJ asked how eroded the job categories would become where

20 the hypothetical person was moderately limited in the ability to reach overhead – i.e., the person

21 could only reach overhead three hours or less per shift.  (AR 63.)  The VE responded that the jobs

22 of assembler and cashier would be eroded in number by 30 percent and housekeeper jobs would be

23 eroded approximately 90 percent.  (AR 63.)

24        As a second follow-up question, the ALJ asked what job erosion would occur if the

25 hypothetical person had moderate to severe pain, and was moderately limited in gross manipulative

26 ability with the right dominant feature, and was slightly limited in the ability to perform simple,

27 repetitive tasks.  (AR 63.)  The VE responded that the jobs identified would be 100 percent eroded

28 with those limitations.

1   The ALJ then posed a third hypothetical involving a person of Plaintiff's age and Plaintiff's

2   education and work experience who could lift and/or push/pull ten pounds occasionally, five pounds

3   frequently; walk, stand, stoop, and bend occasionally, and sit frequently.  (AR 63.)  The VE testified

4   that such a person could not perform Plaintiff's past work, but could perform sedentary, unskilled

5   jobs of order clerk, charge account clerk, and lens inserter.  (AR 64.)

6   The ALJ posed a fourth hypothetical to the VE including the same exertional limitations as

7   in the third hypothetical, but with additional non-exertional limitations: slightly limited in the ability

8   to perform overhead reaching with both extremities, i.e., less than six hours per shift of overhead

9   reaching; gross manipulative abilities slightly limited with the right dominant feature; slightly limited

10   in the ability to perform simple, repetitive tasks; and pain at a slight to moderate level.  (AR 64.)

11   The VE testified that the jobs identified in response to hypothetical three would be eroded by 40

12   percent.  (AR 64.)  The ALJ then inquired as to the amount of job erosion that would occur if such

13   a person could only perform overhead reaching three hours or less in a shift.  (AR 64.)  The VE

14   responded that the job erosion would remain at 40 percent.  (AR 64.)

15   The ALJ then adjusted the hypothetical, asking about the amount of job erosion that would

16   occur if the hypothetical person had a pain level described as severe or moderate; would be

17   moderately limited in the ability to perform gross manipulation; and had a slight limitation for

18   simple, repetitive tasks.  (AR 65.)  The VE responded that the jobs would be eroded 100 percent.

19   Plaintiff's attorney then asked the VE to consider a person with all the limitations imposed

20   by the ALJ in the last follow-up question, but to include a limitation for sitting only one hour at a

21   time with the need for a sit/stand option, and who could walk/stand for "zero hours" during the day.

22   (AR 65.)  The VE testified that such a person would not be able to perform any jobs.  (AR 65.)

23   **3.     The ALJ's Decision**

24   On May 26, 2010, the ALJ issued a decision, finding Plaintiff not disabled since December

25   13, 2007, through the date of decision.  (AR 13-20.)  The ALJ found that Plaintiff had the following

26   severe impairments: psoriatic arthritis and a back disorder.  (AR 15.)  Based on these severe

27   conditions in combination with the functional effects of Plaintiff's non-severe impairments, the ALJ

28   limited Plaintiff to lifting a maximum of 20 pounds occasionally, and 10 pounds frequently; standing

1   and walking for six hours in an eight-hour workday; and sitting six hours in an eight-hour workday.

2   (AR 16.)  The ALJ also found Plaintiff had slight limitations in the ability to perform overhead

3   reaching with both upper extremities; slight limitations in gross manipulation with the right

4   dominant hand; and a slight limitation in the ability to perform simple, routine repetitive tasks. (AR

5   16.)  The ALJ found that Plaintiff would need only occasional supervision, and would experience

6   slight to moderate pain.  (AR 16.)

7          Based on this RFC assessment, the ALJ determined that Plaintiff could not perform his past

8   relevant work as a carpenter/construction worker.  (AR 19.)  The ALJ also found that, because of

9   Plaintiff's limitations, his ability to perform all unskilled, light work was eroded. (AR 19.)  Thus,

10  a VE provided testimony, as set forth above, regarding the types of unskilled, light work Plaintiff

11  retained the ability to perform given his existing limitations.  (AR 19-20.)  As the VE testified there

12  was light, unskilled work that Plaintiff could perform given his limitations, the ALJ concluded that

13  Plaintiff was not disabled under the law.  (AR 20.)

14         Plaintiff sought review of this decision before the Appeals Council.  (AR 7.)  On November

15  5, 2010, the Appeals Council denied review.  (AR 1-5.)  Therefore, the ALJ's decision became the

16  final decision of the Commissioner.  20 C.F.R. § 404.981.

17  **D.    Plaintiff's Contentions on Appeal**

18         On December 27, 2010, Plaintiff filed a complaint before this Court seeking review of the

19  ALJ's decision.  Plaintiff asserts several deficiencies in the ALJ's decision; Plaintiff contends that

20  remand is required because (1) new and material evidence was presented after the ALJ issued the

21  decision denying benefits; (2) the ALJ improperly evaluated Plaintiff's conditions at the Second Step;

22  (3) by failing to find that Plaintiff's knee and shoulder conditions were severe, the ALJ's analysis at

23  the Third Step was deficient; (4) the ALJ improperly discredited Plaintiff's lay testimony; (5) the ALJ

24  failed to properly consider Plaintiff's borderline age; (6) the ALJ should have employed the use of

25  the Vocational-Medical Guidelines (the "Grids") to find Plaintiff disabled; and (7) the hypotheticals

26  posed to the VE were impermissibly vague and the VE's responses regarding job erosion were not

27  specific.

28

1

**SCOPE OF REVIEW**

2    The ALJ's decision denying benefits "will be disturbed only if that decision is not supported

3 by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir.

4 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that

5 of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must

6 determine whether the Commissioner applied the proper legal standards and whether substantial

7 evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d

8 909, 911 (9th Cir. 2007).

9    "Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v.*

10 *Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such

11 relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

12 *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305

13 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the

14 evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may

15 not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*,

16 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

17

**APPLICABLE LAW**

18    An individual is considered disabled for purposes of disability benefits if he is unable to

19 engage in any substantial, gainful activity by reason of any medically determinable physical or

20 mental impairment that can be expected to result in death or that has lasted, or can be expected to

21 last, for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A),

22 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003). The impairment or

23 impairments must result from anatomical, physiological, or psychological abnormalities that are

24 demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of

25 such severity that the claimant is not only unable to do his previous work, but cannot, considering

26 his age, education, and work experience, engage in any other kind of substantial, gainful work that

27 exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

28

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability. In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1. *Id.* §§ 404.1520(d), 416.920(d). If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work. *Id.* §§ 404.1520(f), 416.920(f). If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* §§ 404.1520(g), 416.920(g). If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps. *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

## DISCUSSION

**A.      Plaintiff's Submission of Additional Evidence to the Appeals Council**

**1.      Arguments of the Parties**

Following the ALJ decision, but prior to the Appeals Council's consideration of Plaintiff's request for review, Plaintiff submitted two sets of additional medical evidence. (*Compare* AR 6, 21-34 ("Set One") *with* AR 4, 444, 445-514 ("Set Two").) As it pertains to Set One (AR 21-34), some of this evidence was already contained in the record (*compare* AR 25, 26, 30, 31, 32, 33, and 34 *with* AR 200, 219, 221, 215, 218, 210, and 209, respectively); some evidence was dated prior to the ALJ's May 26, 2010, decision (*see* AR 27-29); and some evidence was obtained and dated after the ALJ's May 26, 2010, decision (*see* AR 21-24.)

In asserting that the newly submitted evidence requires remand, Plaintiff specifically points to evidence showing that Drs. McMillan and Temnyk are now recommending total knee arthroplasty. (AR 21-24.) Plaintiff contends that these records document Plaintiff's knee condition, which the ALJ

failed to consider at the Second Step of the sequential evaluation, and the ALJ failed to consider the functional limitations of this impairment at the Fourth Step of the analysis.  (Doc. 16, 11:24 - 12:7.) As a result, Plaintiff asserts that the matter should be remanded so that the ALJ can consider these new medical records.  (Doc. 16, 11:23-12:12.)

The Commissioner contends that, pursuant to the implementing regulations, the Appeals Council will only consider evidence newly submitted if that evidence is "new and material" and "relates to the period on or before the date of the [ALJ's] decision."  (Doc. 19, 13:21-24 (quoting 20 C.F.R. § 404.976(b)(1)).)  Here, some of the records Plaintiff asserts require remand are dated *after* the ALJ's decision, thus 20 C.F.R. § 404.976(b)(1) precludes consideration of these records. Further, the chart notes from 2004 and 2005 (AR 27-29) involve a period of time more than a year before Plaintiff's alleged onset date.  These records are not material because Plaintiff was involved in substantially gainful activity at the time these 2004 and 2005 notes and records were documented. Thus, any documented limitations at that time clearly did not prevent Plaintiff from working and would be immaterial to the ALJ's disability decision.  (Doc. 19, 13:25-14:2.)

In his reply brief, Plaintiff asserts that, because the Appeals Council addressed his newly submitted evidence, it may be considered by the Court in the context of Plaintiff's appeal, regardless of whether it post-dated the ALJ's decision.  Plaintiff also asserts that the records here are analogous to the records considered in *Harman v. Apfel*, 211 F.3d 1172, 1181 (9th Cir. 2000), and the Court should remand the matter as the Ninth Circuit ordered in *Harman*.

**2.    Discussion**

Pursuant to 20 C.F.R. § 404.976(b)(1), evidence that is newly submitted to the Appeals Council will be considered as follows:

> The Appeals Council will consider all the evidence in the administrative law judge hearing record as well as any new and material evidence submitted to it which relates to the period on or before the date of the administrative law judge hearing decision. If you submit evidence which does not relate to the period on or before the date of the administrative law judge hearing decision, the Appeals Council will return the additional evidence to you with an explanation as to why it did not accept the additional evidence and will advise you of your right to file a new application . . . .

1    When the Appeals Council denies review, the decision of the ALJ is the final decision of the

2   Commissioner. *Russell v. Brown*, 856 F.2d 81, 83-84 (9th Cir. 1988).  However, any additional

3   evidence considered by the Appeals Council in denying the request for review becomes part of the

4   administrative record for review by this district court.  *See Ramirez v. Shalala*, 8 F.3d 1449, 1452

5   (9th Cir. 1993); *see also Harman v. Apfel*, 211 F.3d 1172, 1179-80 (9th Cir. 2000), *cert. denied*,

6   531 U.S. 1038 (2000) (the court may properly consider the additional materials because the Appeals

7   Council address them in the context of denying the appellant's request for review).  To justify a

8   remand, the claimant must establish that the new evidence is both new and material.  To be material,

9   new evidence must bear "directly and substantially on the matter in dispute." *Ward v. Schweiker*,

10   686 F.2d 762, 764 (9th Cir. 1982); 42 U.S.C. § 405(g).  Additionally, the claimant must show that

11   there is a "reasonable possibility" that the new evidence would have changed the outcome of the

12   administrative hearing. *See Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380 (9th Cir.

13   1983); *Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001), *as amended on* December 21, 2001.

14    As noted above, two sets of additional evidence were apparently submitted by Plaintiff's

15   counsel to the Appeals Council following the ALJ's decision.  Set One was submitted on September

16   9, 2010, and included records from Dr. McMillan dated July 19, 2010, and a report from Dr. Temnyk

17   dated August 16, 2010, among other records.  (AR 6.)  Plaintiff's counsel also noted that he was

18   attempting to obtain additional records from Dr. Del Paine's office.  (AR 6.)

19    Set Two was submitted on September 21, 2010.  (AR 444.)  These records contain treatment

20   notes from Dr. Del Paine's office.  (AR 445-514.)  Set Two, submitted on September 21, 2010, was

21   expressly incorporated into the record by the Appeals Council on November 5, 2010, and was

22   labeled as Exhibit F.  (*See* AR 5, 445-514.)  The Appeals Council does not in any way reference the

23   evidence submitted in Set One or even acknowledge that the evidence was received, yet this medical

24   evidence somehow found its way into the record.  (*See* AR 21-35.)

25    Neither Plaintiff nor the Commissioner discuss the evidence contained in Set Two and found

26   at Exhibit 13.  (AR 445-514.)  Rather, both parties focus on Set One.  Plaintiff argues this evidence

27   is "important" because it confirms Plaintiff's worsening knee problem which the ALJ failed to

28

1 consider at the Second Step, and it shows that Plaintiff was functionally limited from walking for

2 six hours per day, contrary to the ALJ's RFC finding in the Fourth Step.  (Doc. 16, 11:26-12:7.)

3      It is not clear from the record that the Appeals Council considered the evidence contained

4 in Set One such that the Court may review it pursuant to *Harman,* 211 F.3d at 1179-80.  However,

5 even assuming that the Appeals Council considered this evidence in reaching its decision denying

6 review, Plaintiff has not established that this evidence is material to the ALJ's decision such that

7 remand should be ordered.[5]

8      First, many of the records that were newly submitted were actually reproductions of evidence

9 already contained in the record at the time of the May 26, 2010, ALJ decision.  Simply stated, some

10 of the evidence in Set One that was submitted by Plaintiff's counsel on September 9, 2010, to the

11 Appeals Council was not *new* evidence.  Second, the evidence that was new, either because it was

12 dated after the ALJ's decision and is therefore not contained in the record (AR 21-24) or was dated

13 prior to the ALJ's decision but was not contained in the record (AR 27-29), is not material to the

14 ALJ's determination.  The new evidence consists only of reports offered by Drs. McMillan and

15 Temnky (AR 21-24) and 2004 through 2005 treatment notes entered by an unspecified provider (AR

16 27-29).

17      As to the July 19, 2010, medical report from Dr. McMillan, it merely notes what is already

18 in the record: Plaintiff has osteoarthritis in his right knee, and a total knee replacement is the

19 recommended treatment.  (*Compare* AR 21-22 *with* AR 200, 206.)  Dr. McMillan had already

20 indicated in December 2004 that Plaintiff would eventually need total knee replacement as treatment

21 for his osteoarthritis.  (AR 206 ("treatment options for his arthritis . . . consist mainly of arthroplasty

22 [knee replacement] options, which both he and I agree are probably not appropriate for him at this

23 point").  Dr. Greenlaw noted in October 2006 that Plaintiff was "going to be a candidate for total

24 knee replacement in the very near future." (AR 200.) The August 16, 2010, report from Dr. Temnyk

25

26     [5] As the Court finds that Plaintiff has not met his burden to show materiality, the Court does not reach the

27 question of whether Plaintiff must show good cause for his late submission to the Appeals Council.  *See Mayes v. Massanari*, 276 F.3d at 455 (amending opinion to state "[w]e need not decide whether good cause is required for submission to the Appeals Council, as Mayes conceded in her briefs that good cause was indeed required); *Brent v.*

28 *Astrue*, No. EDCV 09-519-MAN, 2010 WL 3521788, at * 4-5 (C.D. Cal. Sept. 7, 2010).  To the extent a good cause showing is required, Plaintiff has failed to set forth any good cause for his late submissions to the Appeals Council.

confirms what Drs. McMillan and Greenlaw both opined in 2004 and 2006 – that the recommended treatment option for Plaintiff's right knee would eventually be arthroplasty. Plaintiff appears to indicate in his brief that the medical records show that the arthroplasty has already taken place,[6] but the records only indicate that Plaintiff was x-rayed on July 15, 2010, that he was advised that a "[r]ight total knee arthroplasty is indicated," and he would contact Dr. Temnyk "if he decides to undergo right total knee arthroplasty."  (AR 24.)

Beyond the fact that these records generally only indicate that Plaintiff is now a candidate for arthroplasty, the records do not show that Plaintiff is experiencing functional impairments in his ability to do basic work activities as a result of his knee condition. (*See* AR 24.)  Plaintiff suggests that the records corroborate that Plaintiff is impacted in his ability to walk and stand, but neither Dr. McMillan nor Dr. Temnyk actually opined that Plaintiff was having difficulty walking and standing – which is the aspect of the ALJ's RFC assessment that Plaintiff challenges.  To satisfy the materiality requirement, Plaintiff has the burden of showing that there is a "reasonable possibility" that consideration of these records by the ALJ will change the administrative decision.  The records from Drs. McMillan and Temnyk do not establish any functional limitations from Plaintiff's knee condition; they only establish that the relevant treatment option is knee replacement, which is consistent with the records already considered by the ALJ.  Because the new records do not indicate any further functional limitations that were not considered by the ALJ, they do not establish a basis for changing the ALJ's determination.  *See Sample v. Schweiker*, 694 F.2d 639, 642-43 (9th Cir. 1982) (noting that the existence of a diagnosed emotional disorder "is not per se disabling," and that "there must be proof of the impairment's disabling severity").

Finally, the treatment notes from 2004 through 2005 indicating Plaintiff's reports of knee pain are from an unspecified provider and are dated at a time when Plaintiff was still working. (*See* AR 27-29.)  The fact that Plaintiff reported knee pain in 2004 and 2005 has little bearing on his functional limitations or abilities related to his knee condition during the relevant disability period – i.e., from December 2007 through May 26, 2010, particularly because he received ongoing

---

[6] (Doc. 16, 11:23-25 ("Medical evidence detailing Plaintiff's knee problems, necessitating total knee arthroplasty (TKA), which apparently occurred in 2010, but after the ALJ decision, was submitted and made part of the record.").)

1    medication and treatment for his knee condition, had an intervening knee surgery in December 2004,

2    and continued to work for years after reporting this knee pain and undergoing knee surgery.  (AR

3    222-24.)  While this evidence does not appear to have been reviewed by the Appeals Counsel, the

4    Court finds that Plaintiff has not established that there is a reasonable possibility that the evidence

5    would change the ALJ's determination as to Plaintiff's functional limitations, even if it had been

6    reviewed.

7         As to Set Two, the evidence that was incorporated into the record by the Appeals Council

8    at Exhibit F, Plaintiff makes no argument as to the materiality of that evidence.  Upon independent

9    review, the Court finds that the evidence is not material to the ALJ's decision and does not support

10   a remand.  In fact, one of the most recent treatment notes by Dr. Del Paine on June 24, 2010,

11   indicates that Plaintiff was "[d]oing walking in prep[aration] to return to work."  (AR 448.)  This

12   medical report supports both the ALJ's credibility assessment finding that Plaintiff was inconsistent

13   in his statements that he could not walk more than a half-block and the ALJ's rejection of Dr. Del

14   Paine's November 2009 report indicating that Plaintiff could not walk or stand *at all* in an eight-hour

15   day.  (*Compare* AR 448 *with* AR 440 (Dr. Del-Paine opined Plaintiff could not stand or walk at all

16   in an eight-hour day), and AR 52 (Plaintiff testified he could only walk a block-and-a-half).)[7]

17   Plaintiff makes no argument regarding the materiality of these records, and the Court finds that they

18   are not material because these records tend to support the ALJ's decision rather than indicate a

19   reasonable possibility that the ALJ would change its decision if they were considered on remand.

20   **B.    The ALJ's Consideration of Plaintiff's Knee and Shoulder Conditions**

21        In his argument regarding the submission of new evidence (*see* Doc. 16, 11:27-12:4),

22   Plaintiff contends that the ALJ erred at the Second, Third, Fourth, and Fifth Steps of the sequential

23   evaluation by failing to adequately consider Plaintiff's knee condition and shoulder conditions.

24   Plaintiff alleges that the ALJ "inexplicably failed to discuss [Plaintiff's knee condition] at Step 2, and

25

26         [7] Moreover, even to the extent that the existence of additional medical records after July 2008 tends to negate
27   the ALJ's reasoning that Plaintiff was less credible because he had no medical records after July 2008 (*see* AR 17), the
     records still do not evidence a reasonable possibility that the ALJ's decision would change on remand given the number
28   of other reasons that the ALJ determined reflected a lack of credibility on the part of Plaintiff (*see* AR 18.)  Moreover,
     Plaintiff makes no argument in this regard.

failed to make a severity finding." (Doc. 16, 11:27-28.)  Further, the ALJ failed to include the functional limitations of Plaintiff's knee condition in the RFC assessment at the Fourth Step, and thus posed inadequate hypotheticals to the VE for purposes of satisfying the Commissioner's burden at the Fifth Step. (Doc. 16, 12:2-4.)  Regarding Plaintiff's shoulder, he argues that the "slight" overhead reaching limitation in the ALJ's RFC assessment is predicated on Plaintiff's shoulder impingement, but there is no finding that the shoulder impingement is severe at Step Two, which is error. (Doc. 16, 13:27-14:2.)[8]

The Commissioner responds that, "[r]egarding Plaintiff's knees, given Plaintiff's daily activities and treatment records showing Plaintiff's primary complaint was his back, not his knees, it was appropriate for the ALJ to find Plaintiff's knee impairment not severe." (Doc. 19, 11:7-9.) The Commissioner also asserts that Plaintiff's shoulder condition was considered throughout the ALJ's RFC assessment, and the shoulder impairment was the basis of Dr. Fast's opinion regarding Plaintiff's overhead reaching limitation, which was incorporated into the RFC. (Doc. 19, 11:18-20.)

## 1.    Any Error At the Second Step was Harmless

At the Second Step of the sequential evaluation, the ALJ determines whether the claimant has any impairment that significantly limits his ability to perform basic work activities. 20 C.F.R. § 416.920(c). "An impairment is not severe if it is merely 'a slight abnormality' (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citing Social Security Ruling ("SSR") 96-3p (1996)).

While the Commissioner's argument implies that the ALJ actually made a finding that Plaintiff's knee impairment was not severe, no such finding appears in the ALJ's decision. The ALJ found that Plaintiff "has the following severe impairments: psoriatic arthritis and back disorder." The ALJ then stated that, "[a]s will be fully discussed below, the above impairments caused more than minimal functional limitations." (AR 15.) That is the totality of the express findings at the

---

[8] To the extent that Plaintiff asserts that "[n]ew evidence submitted shows Plaintiff has a shoulder impairment" and cites page 30 of the Administrative Record, this evidence was already contained in the record at the time of the ALJ's decision. (*Compare* AR 30 *with* AR 221.)

Second Step.  Thus, the Commissioner's implication that there is a non-severe finding with respect to Plaintiff's knee condition is not borne out in the ALJ's decision.  However, any error at the Second Step in failing to make a determination whether Plaintiff's knee or shoulder conditions were severe is not prejudicial because the Second Step was resolved in Plaintiff's favor, and the ALJ continued the sequential evaluation.  *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (failure to list an impairment as severe at the Second Step was harmless error where the ALJ considered the functional limitations posed by that impairment later in the decision).

### 2.      The ALJ's Finding at the Third Step

Plaintiff asserts that because the ALJ did not adequately make findings at the Second Step with regard to whether his shoulder and knee conditions were severe, the Third Step findings are necessarily impacted.  (Doc. 16., 14:2-4 ("As a result consideration of equivalence to a Listing at Step 3 is incomplete.  Plaintiff asks for a remand for more accurate and complete findings at Step 2 and 3, considering all impairments.").)  As the Commissioner correctly notes, however, Plaintiff has not raised any argument how his conditions meet or equal a Listing.  Despite being represented by counsel at the hearing, the record does not contain evidence that the issue of meeting or equaling a listed impairment was raised to the ALJ for consideration.

In *Burch v. Barnhart*, the Ninth Circuit held that "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." 400 F.3d 676, 683 (9th Cir. 2005).  Without any specific argument how the knee and shoulder conditions or any other of Plaintiff's conditions meet or equal a listed impairment, there is no merit to Plaintiff's contention that the ALJ erred at the Third Step of the sequential analysis.  Even assuming an error at the Third Step, Plaintiff's failure to identify any potential listings that he meets or equals does not satisfy his burden of establishing harmful error.

### 3.      Consideration of Knee and Shoulder Conditions at the Fourth Step

Plaintiff asserts that the ALJ failed to consider the functional limitations caused by Plaintiff's knee and shoulder conditions.  With respect to Plaintiff's shoulder condition, Dr. Fast incorporated a limitation for overhead reaching, accounting for a functional limitation as a result of Plaintiff's

shoulder condition, regardless of whether it was a severe or non-severe condition.  (AR 350.)  This limitation was incorporated into the RFC limitation.  (AR 16.)  The ALJ did not fail to consider the effects of Plaintiff's shoulder condition at the Fourth Step.

With regard to Plaintiff's knee condition, Plaintiff points to no evidence that indicates a functional limitation arising from the knee condition, other than reports of pain.  Plaintiff alleges in conclusory fashion that the RFC finding that Plaintiff can stand and walk for 6 hours is erroneous in light of Plaintiff's knee condition, but points to no evidence of functional limitation that the ALJ failed to consider.  For example, while Dr. Greenlaw opined that Plaintiff should avoid squatting, twisting, or straining his knee as much as possible (AR 200), this recommendation was provided in October 2006, but Plaintiff continued to work for more than a year with these noted limitations.  Thus, any impairment indicated by Dr. Greenlaw did not prevent Plaintiff from completing basic work activities at that time.  Further, Dr. Greenlaw's report provides no information relevant to Plaintiff's limitations during the relevant disability period, which began in December 2007.

Additionally, while Dr. McMillan treated Plaintiff's right knee in 2004 and 2005, he noted no limitations outside the pain and discomfort that Plaintiff would continue to experience as a result of the osteoarthritis, for which medication and steroid injections were prescribed and administered.  Moreover, during the time that Dr. McMillan treated Plaintiff, Plaintiff continued to work, evidencing that his pain did not affect his ability to perform basic work activities.  Other than Plaintiff's reports of pain, Plaintiff points to no limitation that the ALJ failed to consider at the Fourth Step.

The only limitation associated with Plaintiff's knee condition is the pain that Plaintiff reported, and his inability to walk very far because of the pain.  However, the degree of pain that Plaintiff reported was discredited by the ALJ based on Plaintiff's inconsistent statements about his ability to walk and by the extent of his daily activities.  (AR 18.)  Thus, the ALJ did not fail to account for this limitation in the Fourth Step.

**C.   Plaintiff's Credibility**

Plaintiff argues that the ALJ erred in making only a general finding that Plaintiff's testimony was not credible to the extent that it was inconsistent with the RFC. (Doc. 16, 14:26-15:1.)  Plaintiff

also asserts that the ALJ did not consider Plaintiff's credibility until after completing the RFC assessment; Plaintiff contends this is error because the credibility of his statements should be considered before the RFC is completed.

The Commissioner disputes Plaintiff's contention that the credibility assessment by the ALJ was too general.  In particular, the Commissioner notes that the ALJ provided several specific bases for rejecting Plaintiff's credibility including that there were few medical records despite Plaintiff's complaints of disabling pain, Plaintiff gave inconsistent statements regarding his ability to walk, and the extent of Plaintiff's daily activities evidenced more ability than what Plaintiff acknowledged in his testimony.  (Doc. 19, 12:22-13:13.)  The Commissioner also asserts that because Plaintiff failed to address the specific reasons the ALJ provided in giving less weight to Plaintiff's lay testimony, "Plaintiff has waived arguments to the contrary."  (Doc. 19, 13:11-13.)

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* The claimant is not required to show that her impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id.* (quoting *Lingenfelter*, 504 F.3d at 1036).  If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection. *Id.*  As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226-27 (9th Cir. 2009); 20 C.F.R. §§ 404.1529, 416.929.  Other factors the ALJ may consider include a claimant's work

1  record and testimony from physicians and third parties concerning the nature, severity, and effect of

2  the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

3  Plaintiff's contention that the ALJ did not perform the credibility analysis before the ALJ

4  determined the RFC lacks merit.  Although the ALJ set out the RFC determination as a specific and

5  express finding, followed by a discussion of the evidence (including Plaintiff's lay statements and

6  credibility) that informed the RFC determination, this does not necessarily indicate that the RFC was

7  impermissibly assessed *before* the credibility of Plaintiff's lay testimony was considered.  Moreover,

8  the fact that the ALJ stated that Plaintiff's subjective complaints "do not warrant additional

9  limitations beyond those established in the residual functional capacity" does not necessarily mean

10 that Plaintiff's statements were considered *after* the RFC was formulated.  Rather, the Court views

11 the ALJ's statement in this regard as a way of clarifying the portions of Plaintiff's lay testimony that

12 were rejected – i.e., anything that was not adopted in the RFC assessment was rejected by the ALJ

13 as not credible.  The particular order of the ALJ's wording does not constitute evidence of harmful

14 error.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002) (the ALJ need only articulate the

15 evidence sufficiently to enable the court to trace his or her path of reasoning); *Reddy v. Commodity*

16 *Futures Trading Comm'n*, 191 F.3d 109, 125-26 (2d Cir. 1999) (a reviewing court will not be

17 "disposed to overturn a sound decision if the agency's path, although not ideally clear, may

18 reasonably be discerned." (citations omitted)).

19 Plaintiff's argument that the ALJ only made a general credibility finding is also inaccurate.

20 As correctly noted by the Commissioner, the ALJ provided several specific reasons for discounting

21 Plaintiff's credibility, including inconsistencies in Plaintiff's testimony regarding his ability to walk

22 and Plaintiff's complaints of pain in relation to his daily activities.  (AR 18.)   Plaintiff makes no

23 argument regarding the legal sufficiency of the reasons provided by the ALJ in the credibility

24 determination.  As such, any argument in this regard is waived.  *Greger v. Barnhart*, 464 F.3d 968,

25 973 (9th Cir. 2006).

26 **D.   Borderline Age Issue**

27 Plaintiff argues that he was entitled to an older age category; had the ALJ properly

28 categorized Plaintiff as someone of "advanced age," Plaintiff would have been per se disabled under

25

1   application of the Medical-Vocational Guidelines.  (Doc. 16, 9:23-11:21.)   The Commissioner

2   asserts that, pursuant to *Lockwood v. Comm'r Soc. Sec. Admin.*, 616 F.3d 1068, 1069 (9th Cir. 2010),

3   the ALJ adequately considered Plaintiff's borderline age and acted within his discretion not to apply

4   an older age category.  (Doc. 19:14:23-15:6.)

5        As the Ninth Circuit has recently explained, social security regulations divide claimants into

6   three age categories: (1) younger persons (those persons under age 50); (2) persons closely

7   approaching advanced age (those persons age 50-54), and (3) persons of advanced age (those persons

8   age 55 or older).  *Lockwood*,  616 F.3d at 1069; 20 C.F.R. § 404.1563(c), (d), (e).  "Where a claimant

9   is within a few days or a few months of reaching an older age category (a 'borderline situation'), an

10  ALJ has discretion, but is not required, to use the older age category."  *Lockwood*, 616 F.3d at 1069;

11  20 C.F.R. § 404.1563(b).  Title 20 of the Code of Federal Regulations, section 404.1563(b), states

12  the following with regard to the ALJ's consideration of a claimant's age category:

13          We will not apply the age categories mechanically in a borderline situation.  If you
            are within a few days to a few months of reaching an older age category, and using
14          the older age category would result in a determination or decision that you are
            disabled, we will consider whether to use the older age category after evaluating the
15          overall impact of all the factors on your case.

16  20 C.F.R. § 404.1563(b).

17        In *Lockwood*, the claimant applied for disability which was denied by the ALJ, and the

18  district court affirmed.  616 F.3d at 1070-71.  On appeal to the Ninth Circuit, the claimant argued

19  that the ALJ failed to consider, pursuant to § 404.1563(b), whether she should be placed in an older

20  age category for purposes of the disability decision.  *Id.* at 1071-72.  The court determined that the

21  ALJ satisfactorily considered whether to use an older age category.  *Id.* at 1072.  The court reasoned

22  that the ALJ's decision set forth the date of the claimant's birth and stated that she was 54 years old

23  and thus closely approaching advanced age on the date of the ALJ's decision.  *Id.*  The court

24  determined that recitation of the claimant's birthday was an indication that the ALJ was aware that

25  claimant was "just shy of her 55th birthday."  *Id.*  Further, the court explained that the ALJ cited to

26  20 C.F.R. § 404.1563, which prohibits mechanical application of the age categories in borderline

27  situations, indicating that the ALJ had acknowledged and applied the proper legal standard.  *Id.*

28  Finally, the court determined that the ALJ did not apply the age categories mechanically because the

26

ALJ evaluated the overall impact of the factors of the case and relied on the testimony of a vocational expert before finding the claimant not disabled. *Id.* The court held that this was sufficient consideration by the ALJ of the borderline age issue as the regulation "does not impose any obligation [on the ALJ] to make express findings incorporated into the ALJ's opinion." *Id.* at 1073.

Here, as in *Lockwood,* the ALJ noted Plaintiff's date of birth (June 21, 1956) as well as the fact that Plaintiff was an individual closely approaching advanced age, cited to 20 C.F.R. § 404.1563 in the decision, and evaluated all the factors of Plaintiff's case when the ALJ relied on the VE testimony to reach a disability decision. (AR 18, 19.) Plaintiff asserts that he was less than 25 days short of age 55 at the time of the ALJ's May 26, 2010,[9] decision (Doc. 16, 10:8-11), which should entitle him to a borderline age determination and, thus, a different age category. In *Lockwood*, however, the claimant was one month and three days short of being classified into a different age category, and the court held that it was still at the ALJ's discretion to determine whether an older different age category should be applied. Pursuant to *Lockwood*, the ALJ adequately considered Plaintiff's age and was not required to place Plaintiff in an older age category.

**E.     Application of the Medical-Vocational Guidelines**

Plaintiff contends that, because the ALJ found Plaintiff able to perform less than the full range of light work, the Medical-Vocational Guidelines (the "Grids") must be applied to find Plaintiff disabled. (Doc. 16, 8:20-9:21.)

As explained by the Ninth Circuit in *Lounsburry v. Barnhart*, the Grids are applied at the Fifth Step of the analysis pursuant to 20 C.F.R. § 404.1520, and present, in table format, "a short-hand method for determining the availability and numbers of suitable jobs for a claimant." 468 F.3d 1111, 1114 (9th Cir. 2006) (citing *Tackett*, 180 F.3d at 1101). Application of the Grids is predicated on a "claimant suffering from an impairment which manifests itself by limitations in meeting the strength requirements of jobs ('exertional limitations'); they may not be fully applicable where the nature of a claimant's impairments does not result in such limitations ('non-exertional limitations')." *Id.* at 1115 (quoting 20 C.F.R. Part 404, Subpart p, Appx. 2 § 200.00(e)). Specifically, non-

---

[9] Based on Plaintiff's birthdate of June 21, 1956, which he testified to at the hearing (AR 39), Plaintiff could *not* have been 25 days away from turning 55 on May 26, 2010, as Plaintiff did not turn 55 until June 21, 2011.

exertional impairments – including postural and manipulative limitations such as difficulty reaching, handling, stooping, climbing, crawling, or crouching – may, if sufficiently severe, limit a claimant's functional capacity in ways not contemplated by the Grids. *Id.*

Where a claimant suffers from both exertional and non-exertional limitations, the ALJ must consult the Grids first and determine, based purely on the claimant's exertional limitations, whether a finding of disabled under the Grids is directed. If it is, the Commissioner is bound by the application of the Grids. *Id.* at 1116 ("In other words, where a person with exertional and non-exertional limitations is 'disabled' under the grids, there is no need to examine the effect of the non-exertional limitations. But if the same person is not disabled under the grids, the non-exertional limitations must be examined separately."). Here, the ALJ determined that Plaintiff retained the ability to lift/carry 20 pounds occasionally and 10 pounds frequently, and that Plaintiff could stand and walk for six hours and sit for six hours each in an eight-hour workday. (AR 16.) Light work, is defined by 20 C.F.R. § 404.1567 as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. . .

As Plaintiff suffers additional non-exertional limitations in his ability to reach overhead and perform gross manipulation with his right extremity, under *Lounsberry* and *Tackett*, the ALJ was required to *first* consult the Grids to determine whether Plaintiff would be considered disabled solely on the basis of his exertional limitations. Plaintiff was found to retain the ability to meet the exertional requirements of light work; therefore, he was not considered disabled under the Grids. However, the ALJ recognized that, on the basis of Plaintiff's *non-exertional* limitations, a full range of light work would not be possible. (AR 16.) Thus, the ALJ was required to seek the testimony of a VE to determine to what degree Plaintiff remained able to perform work in the light category. *Hoopai v. Astrue*, 499 F.3d 1071, 1075 (9th Cir. 2007); *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988).

Plaintiff's assertion that he must be found disabled under the Grids misses the distinction noted by *Lounsbury* – i.e., that in examining whether Plaintiff can perform light work under the Grids, the ALJ is required to evaluate only the exertional requirements, because these are the limitations reflected by the Grids.  The Grids do not account for non-exertional limitations, and thus are not necessarily applicable where a claimant, such as Plaintiff, presents with a combination of exertional and non-exertional limitations.  The error identified by the court in *Lounsbury* was that the ALJ failed to consult the Grids *at all* because the claimant presented with non-exertional limitations.  The court explained that, instead, "the ALJ should have first inquired if Lounsbury was disabled under the grids on the basis of her exertional limitations alone."  *Lounsbury*, 468 F.3d at 1116.

Here, Plaintiff appears to argue that the ALJ should have considered Plaintiff's non-exertional limitations to determine that he could not do a full range of light work, as the ALJ did, and *then* apply the Grids to find him disabled because the non-exertional limitations prevented him from a full range of light work.  This is not what *Lounsbury* or the Regulations require.  In sum, the ALJ correctly determined that Plaintiff was not disabled under the grids, and therefore, separately examined the non-exertional limitations.

## F.   The Clarity of Hypotheticals Posed to VE

Where an ALJ relies on the testimony of a VE at the Fifth Step of the sequential analysis, the ALJ must pose to the VE an accurate hypothetical.  *See, e.g., Ostenbrock v. Apfel*, 240 F.3d 1157, 1162-63 (9th Cir. 2001).  To be accurate, an ALJ's hypothetical to the VE must set out all of the claimant's impairments and limitations.  *See, e.g., Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) (citing *Baugus v. Sec'y of Health & Human Servs.*, 717 F.2d 443, 447 (8th Cir. 1983)).  The ALJ's depiction of the claimant's limitations must be "accurate, detailed, and supported by the medical record."  *Tackett*, 180 F.3d at 1101.

Plaintiff asserts that the limitations posed to the VE were impermissibly vague because they were expressed in terms of being "slight."  The Commissioner contends that courts have routinely upheld limitations posed to the VE in terms such as "slight" and "moderate," and Plaintiff provides no citation to caselaw to support his argument that these terms are impermissibly vague.

As to the hypothetical posed to the VE regarding a "slight" limitation in an ability to perform overhead reaching, the ALJ defined "slight" as retaining the ability to perform overhead reaching no more than six hours in an eight-hour day. (*See* AR 63.) Thus, this limitation was not vague, but rather was specifically defined by the ALJ in posing the hypothetical.

Plaintiff also claims that a "slight" limitation in the ability to perform simple, repetitive tasks is impermissibly vague. Plaintiff asserts that it is "unclear whether this means that Plaintiff cannot even do simple, routine, repetitive tasks some of the time. Since the unskilled jobs identified by the VE require the ability to perform simple, routine, repetitive tasks all of the time, because the jobs are unskilled, then Plaintiff cannot perform even these jobs." (Doc. 16, 13:4-7.) As concluded by the court in *Chinchilo v. Comm'r of Soc. Sec.*, No. CIV S-06-1653-CMK, 2008 WL 1970092, at *14 (E.D. Cal. May 2, 2008), a "slight" limitation in the ability to perform simple, repetitive tasks essentially means that Plaintiff could "mostly perform such tasks." In other words, the ALJ did not find that Plaintiff had a "slight ability" to perform simple, repetitive tasks, but rather, described Plaintiff's limitation as "slight." Plaintiff points to no authority indicating that a "slight" limitation would be per se disabling or would preclude Plaintiff from performing work at the lowest level of simple, repetitive work – i.e., work at reasoning level 1, as defined by the Dictionary of Occupational Titles ("DOT"), which is the reasoning level that applies to the housekeeping category of work identified by the VE as work that Plaintiff could perform. *See* DICOT 323.687-014.

Plaintiff also asserts that the ALJ's hypotheticals to the VE included a limitation for "slight to moderate pain." (Doc. 16, 13:13-17.) Plaintiff essentially contends that there is no way to quantify "slight to moderate" such that it could be applied by the VE in considering Plaintiff's limitations. Again, Plaintiff sets forth no legal authority indicating that a limitation for "slight to moderate" is one with which the VE is unfamiliar and could not translate into job requirements. Moreover, the limitations posed to the VE were not challenged at the hearing, despite that Plaintiff was represented by counsel and, in fact, Plaintiff's representative used the ALJ's "slight" limitations in formulating his own hypothetical to the VE. (*See* AR 65 ("Assuming the Judge's hypothetical 4B as stated . . . ").)

1    Finally, Plaintiff argues that the jobs identified by the VE require frequent handling, reaching,

2    and fingering.  Plaintiff argues that, "[s]ince the nature of these jobs requires this much reaching and

3    handling, and Plaintiff is limited in these areas, it does not make sense that the VE was able to come

4    up with an erosion of 30% for all three of these dissimilar jobs.  Is the VE actually testifying that

5    70% of housekeepers can do their jobs without reaching?"  (Doc. 16, 12:21-24.)

6    The Commissioner responds that the ALJ posed a hypothetical that included a moderate

7    limitation in the ability to perform overhead reaching and the VE testified that, while the jobs of

8    cashier and assembler would be eroded 30 percent given such a limitation, the job of housekeeper

9    would be eroded 90 percent based on such a limitation.  (Doc. 19, 10:8-12.)  The Commissioner

10   asserts that the VE thus did not clearly "clump all three jobs in the same category, as argued by

11   Plaintiff, but instead used his occupational knowledge to decide how certain limitations would affect

12   the quantity of jobs available to Plaintiff."  (Doc. 19, 10:12-14.)

13   The ALJ posed a hypothetical to the VE that involved a person who had a "slight" limitation

14   in the ability to perform overhead reaching – i.e., not more than six hours in an eight-hour day and

15   had a slight limitation in the ability to perform gross manipulation with the right hand.  The VE

16   testified that with such a person could perform work as a cashier, housekeeper, and assembler of

17   small products, but that given the limitations, jobs in those categories would be eroded by 30 percent.

18   (AR 62-63.)  When the limitation was increased in a follow-up hypothetical to include a moderate

19   limitation in the ability to reach overhead with both extremities – i.e., less than three hours per shift,

20   the VE testified that jobs in the category of cashier and assembler of small products would remain

21   eroded at 30 percent, but jobs in the category of housekeeper would be eroded at 90 percent.  (AR

22   63.)  As articulated by the Commissioner, the VE differentiated the job erosion on the basis of job

23   categories and accounted for the fluctuation in the ALJ's hypothetical limitations.  The Court

24   perceives no error in this testimony or the limitations as set forth by the ALJ.

25                                          **CONCLUSION**

26   Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

27   evidence in the record as a whole and is based on proper legal standards.  Accordingly, the Court

28   DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.

The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Kenneth Joseph Borrelli.


IT IS SO ORDERED.

**Dated:    March 19, 2012**                            **/s/ Sheila K. Oberto**
                                                    UNITED STATES MAGISTRATE JUDGE